WRIGHT, J.
The law directs the clerk of the Common Pleas, in case of an election by a prisoner to be tried in this court, to record the indictment, and to certify to this court a transcript of the record, with the original papers. The trial here, is upon the original indictment, not on the copy. If the original indictment should be 618] *lost, this court would not proceed, because the copy confers on us no authority. It is not easy to discover what particular object the legislature had in view in requiring this record and transcript, with the original papers. We consider the provisions merely directory — and though it is the duty of the clerk to conform to the requisition, we cannot see how the omission to copy into the record the mere introductory part of the indictment, wholly immaterial to the charge against the prisoner, can be of such consequence as to require of us to quash the proceedings. The indictment, so far as substantial and copied, conforms with the original — the variance results from omitting to copy the caption and marginal venue into the record.
The proceedings in the Common Pleas advise us that an indictment was returned by the grand jury, for the murder of Green; that the prisoner was arraigned on it, and elected to be tried here. So far, all is right — these things are certified; but the clerk has not certified who were the grand jury, or who was appointed foreman. Of what consequence can this omission be to the prisoner.
An indictment was returned a true bill — the prisoner was arraigned upon it, and elected to be tried here. The original indictment is here properly found and endorsed, and signed bjr one describing himself foreman. The fact of his being foreman is not contested; but it is urged to us, that the clerk has not certified the fact of his appointment. We cannot think this matter of such consequence as to require the court to quash. We feel less reluctant to decide so, because all these matters are open on the record, and the party can present them after verdict, if he deem it necessary.
It is further objected, that as this indictment was found in March, 1834, and the transcript and papers were not filed with the clerk of the Supreme Court until May, they have not been filed immediately *639 under the statute, and the court cannot proceed. The law requires the Clerk of the Common Pleas immediately to record, and after-wards to make out a transcript, and transmit the papers to the Clerk of the Supreme Court. We think the statute has been substantially complied with, as it regards this matter.
The motion is overruled.
The prisoner being arraigned, pleaded not guilty. Seventy-three jurors were called, out of which twelve were sworn of the jury.
On the part of the state a number of witnesses were called, who proved that the night before Green’s death there was a fire in Dayton — Green was a fire warden -attending, whose duty it was to form '*and preserve the lines, to pass buckets — Thompson was [61& standing by, occasionally making sport of the proceedings — Green peremptorily ordered him into the ranks twice or thrice, and he refused — -when Green struck him with a piece of clapboard he had in his hand, knocked his hat off, and sallied him a little over. He recovered and went off. This was about midnight- — about daylight he was seen by several at the groceries and at the markethouse complaining of Green and threatening to kill him, and was dissuaded from it. About ten o’clock, he went to a justice for a warrant for Green, for the assault and battery, and was dissuaded from it and sent away from one justice. He went to another, was dissuaded and a warrant refused till he paid the costs. He wont for the costs- — -and said he did not want to punish Green, but merely to get him there where he could give him as much as he had given him. Before the warrant was issued, Green being notified, came in. He and Thompson conversed about the blow, and after a moment or two, Green became irritated and said he would do the same again, and if Thompson said much he would knock his heels over his head. At this time he turned and walked a step or two from Thompson, who slipped his right hand down -to about the middle of a three feet club, one and one-half inch in diameter, that he had partly concealed, and seizing the end of it with his left, struck an upward blow on the parietal bone of Green’s head; he fell and died in about four or five hours, of a compression of the brain. The skull was not fractured. The prisoner was intoxicated at night and through the day till the blow was given.
On the part of the prisoner, evidence was offered to prove that the defendant had been occasionally delirious. It was proven that he had been long in habits of intoxication, and had occasionally exhibited symptoms of mcmia-a-potu — and on the morning of the day of the blow, looked wild and appeared strangely. His head was *640 •■cut by the blow Green gave him, and had not been dressed until ■after he struck Green.
Woods, Helfenstein and McNutt,
argued to the jury for the prisoner, and
Mason and Lowe for the state.'
WRIGHT, J. to the jury. The indictment contains three ■charges, or what you have heard called counts in the argument, The
First is,, that Thompson on the 10th of September, 1833, with a 'club held in both hands, feloniously and purposely,, of his deliberate .and premeditated malice, gave Charles R. Green a mortal blow on 620] *the right side of the head, above the ear, of two inches long and-one and one-half inch deep, of which he died.
The second only varies in laying the blow to have -fallen “-on the upper part of the temporal bone, near its juncture with the parietal bone.”
The third is like the first, except that it does not particularly -describe the size of the wound.
These charges against the prisoner are denied by him as untrue —the charges and denial make the issues — which you have sworn to try on the evidence given you in court.
As the state makes these charges, it is incumbent on -the state to prove to your satisfaction every material allegation contained in them. The prisoner is only upon his defence. You take him protected by the presumjrtion of law which attaches to every one in our community, that he is innocent of crime until proven guilty. If the proof falls short of convincing you of the guilt of the prisoner —if the evidence fairly weighed, and carefully examined and reflected upon by you, with the single purpose of drawing nothing from it but the truth, shall leave your minds unconvinced, or in doubt as to the general guilt of the prisoner, or if you are left in -doubt upon any one of the -essential ingredients of the crime charged, such doubt, according to the humanity of our law, entitles the prisoner to a verdict of acquittal, for it is much better that the guilty should go unpunished, than that an innocent person should be wrongfully punished. The doubt, however, which influences .a verdict should be honestly 'entertained. With a sincere -desire to find out the truth ■of the matter submitted to you, you sh-ould carefully examine the acts committed by the prisoner and complained of, with theiattend.in-g ¡circumstances, and, as you are satisfied they establish the truth, *641 so you should find — so you must find, if you regard your duty, whether the result shows the guilt or the innocence of the prisoner. You are required to say, whether in point of fact, the crime charged upon the prisoner was committed by him. With the consequences flowing from your verdict upon the prisoner or upon society you have nothing to do. What is to follow after your verdict is not confided to you, but is by law left with the court. You answer W God that you perform your duty — the other ministers of justice answer to the same Great Being, for the manner they perform theirs. But as the result of your finding on the facts may be to take, the life of a fellow-creature, you should proceed with greater caution, and more scrupulously examine and compare the circumstances. If convinced of the prisoner’s guilt, however much you *may regret it, and wish the fact were otherwise, you must, [621 though you do so reluctantly, pronounce him guilty. If the evidence convince you of his innocence, or leave you in doubt of his guilt, you will gladly pronounce him not guilty.
The several counts in the indictment are not materially different —the three charges are, in legal contemplation, one and the same, and you need not trouble yourselves with the difference between them. The real questions presented to your consideration by the issues are these:
1. Is Charles R. Green dead ?
2. Did he come to his death by means of a blow given by Thompson on the head with a club in Montgomery county?
3. Was the blow given by the prisoner?
4. Was he, when the blow was given, of sane mind?
5. If so, was the blow given purposely mid maliciously, of deliberate and premeditated malice? or was it given purposely and maliciously, but without deliberation and premeditation? or was it given without malice upon a sudden quarrel ? or was it unintentionally given, while the prisoner was engaged in an unlawful act?
You may find it convenient to proceed in the consideration of these propositions in the order I have stated them. In the order presented I intend to submit upon them a few remarks, with the design of assisting you in understanding the law of the case, and in the discharge of your duty.
1. Then, is Green dead ? Of this there is no dispute before you, and no conflietion in the evidence.
2. Did he come to his death by means of a blow on the head given by the prisoner in this county? You have before you evidence of the circumstances attending the various transactions be *642 tween the deceased and the prisoner, and the times and places of their occurrence. The nature of the blow and wound, the time the deceased lived after receiving it, and the opinions of the attending surgeons who dissected the head after death, are before you. From this evidence you will determine, whether the blow was given by the prisoner in this county, and whether it occasioned his death. If you are satisfied of the death of Green, by the blow of the prisoner, then,
3. The next question is, was the prisoner when he gave the blow of sane mind ? A person without the light of reason is not capable of committing crime, or the subject of punishment. It is urged in behalf of the prisoner, that satisfactory proof has been made, that when this blow was given, the prisoner was not of sane mind. It is 622] *sought to establish the derangement of mind by the evidence, that at several times heretofore the prisoner had manifested an alienated mind. The fancying that his feet were glass; that snakes and mice were passing through and under them — the notion at another time, that persons were in the field, and about his premises, with intention to do him barm — his efforts at several times to commit violence upon the horses and other property of his neighbors, in revenge of imaginary injuries — the attempt to force his own child into the canal, under the mistaken idea that a log lying there was an ox, or a horse, that required assistance— and other circumstances have been detailed to you. It is also urged that the blow given by the deceased upon the head of the prisoner, was of sufficient violence to derange his intellect. To establish this, evidence has been given of the character of the blow, and the nature of the wound, and its situation on the head. The conduct of the prisoner when found by Houser in the street after the fire — his moaning after he returned home that night, and his wild looks and singular conduct the next morning before he met Green, — r-all have been detailed to you by the witnesses. It is proper that you should weigh all these facts. If they satisfy you that when the prisoner struck the deceased he was laboring under insanity, or, such an estrangement of mind as left him without discretion to discern the difference between good and evil, or unconscious that he was doing wrong, he should be acquitted altogether* But, on the other hand, if his mind was such, that he retained the power of discriminating, or to leave him conscious he was doing wrong, a state of mind in which at the time of the deed, be was free to forbear, or to do the act, he is responsible as a sane man. So too, if his madness was artificial, voluntarily brought upon him *643 self by intoxication, the law looks upon such phrenzy as an aggravation of the offence, not as excusing its commission. It is not allowed a man to prepare by one crime an excuse for committing another and a greater one. Yet if a man is laboring under a confirmed madness, he is not accountable, and the cause which produced the delirium is immaterial, unless it be brought upon the person by his own wrong immediately antecedent to the act committed under its influence. If you find the death resulted from a blow given by the prisoner while in sane mind, you will then inquire,
5. Whether the death-blow was given purposely, of deliberate and premeditated malice ? Does the evidence satisfy your minds the blow was given with a design to kill the deceased ? The design or purpose to kill, you must gather from the circumstances attending the transaction, the instrument employed, the place of the blow, and the ^manner of inflicting it; all the circumstances, and their natural [623 and ordinary tendency to destroy life. You may also deduce the purpose of the prisoner from his declarations at the time of the transaction and those previously made. But in considering the declartions of a prisoner, detailed by witnesses, you should sift the evidence carefully, and critically examine the circumstances under which they were uttered, and heard, and are detailed. Declarations made by a prisoner when agitated either by excited passion or depressed spirits, should not have much weight given to them — they are often thoughtlessly made; are imperfectly heard; inaccurately remembered; and most carelessly detailed in evidence. There is danger, that the witness may substitute his own words for those of the prisoner, and convey to the jury ideas never within the contemplation of the prisoner. You will examine this branch of the evidence then with caution. If, however, the blow given in this instance was palpably calculated to destroy life, the law presumes the perpetrator intended to produce that effect, and holds him responsible for it. If you find the act done purposely, the next inquiry is, was it done deliberately, with premeditation.
If the prisoner meditated upon the purpose to kill, deliberated upon it, and coolly, or when only heated by voluntary intoxication, formed the design to kill at any time before he struck the blow, the law holds the act deliberate and premeditated. It so holds, also, where there has been provocation and consequent heated blood, if from lapse of time or other cause, passion has subsided and reason resumed her empire, before the offence was perpetrated. These matters should be judged of reasonably, according to the lights of *644 experience. If the provocation were slight and the retort greatly beyond, it weighs but little in conducing to the belief, that the ordinarily deliberate operations of the mind were interrupted by that cause: so if considerable time elapses between the provocation and: revenge sought, as it is not usual for the passions to continue excited or the blood heated so long, it is unreasonable to suppose the' excitement and hot blood the cause of the subsequent act, without the deliberate aid of the will.
If the aet was done deliberately, was it the result of malice? Malice is an evil design, a mind bent on mischief — it is not essential that the design of mischief should'be directed exclusively against the party injured. The law adjudges that feeling malicious, which impels its possessor forward into acts of aggression, evincing a heart beyond the control of social duty, and bent on mischief. If 624] *the act of the prisoner was the consequence of a corrupt motive, and an evil design to injure, it is, in the eye of the law, malicious.
If you find the act done, but without malice, you will inquire if it was done in a sudden quarrel, under such provocation, as, making allowance for the infirmities of human nature, to exclude the idea of deliberation or malice? If not, was the act unintentionally dono while the prisoner was engaged in some unlawful act. As to the sudden quarrel and- provocation, evidence has been introduced to show that Green gave the prisoner irritating language at the justice’s office just before the fatal blow. I feel bound to say as to this evidence, that- in law, mere words are not regarded a sufficient provocation to justify even an assault and battery, and much less can they be relied upon to excuse homicide. It is urged on the part of the state that the lapse of six or eight hours between the only material provocation, the blow at the fire, before the fatal blow was given, precludes the idea of continued heat and j>assion. It is also urged that a cool and deliberate purpose of mind is conclusively evidenced in the prisoner-, by his inquiries and continued efforts tO' secui-e a suitable club to inflict the blow, and in expressing his object to px-ocure a legal warrant, as a means of compelling Green to come within his reach. You will examine all the circumstances in evidence and from the whole judge.
The law which determines the offence of the prisoner, if he is guilty, is found in our own statute book, and it is unnecessary to follow counsel in their discussions upon the laws of other countries. He must be condemned by our own law's, or not at all.
If you find the death occasioned by the prisoner purposely, of *645 deliberate and premeditated maliee our law pronounces him guilty of murder in the first degree, and you should so find.
If the blow which occasioned the death was purposely and maliciously given by the prisoner without deliberation or preconceived design, or was an act upon which his mind had not previously resolved, our law defines the offence murder in the second degree, and you should so find.
Malice and the purpose to kill are essential ingredients in both the degrees of murder — the difference between them is determined by the presence or absence of deliberative purpose ox premeditation.
If the blow was given without malice or purpose to kill, in the heat of a sudden quarrel, or, without intention to strike the deceased, while the prisoner was engaged in an unlawful act, then our law declares the offence to be manslaughter, and you should so find.
You will have the statute with you — if you find the prisoner *guilty of murder, you must say in your verdict, whether he [625 is guilty of murder in the first or second degree. If you find him guilty of manslaughter you will say so, and need say no more.
If the proof fail to satisfy you of the prisoner’s guilt, or leaves you in doubt of it, or satisfies you that the blow was given by the prisoner, while his mind was so deranged as (o leave him without discretion to discriminate between right and wrong, or unconscious of crime, you will find that he is not guilty, and no more.
The jury returned a verdict of guilty of murder in the second degree. The prisoner being afterwards set at the bar, and having nothing to say why sentence should not be pronounced, was addressed by WRIGHT, J. as follows:
Matthew Thompson ! You have been found guilty by a jury of your fellow-citizens, who have patiently listened to your case, of the murder of Charles R. Green, and we have no doubt that you did the deed. Yielding to the suggestions of evil passions, you have nursed, cherished, and stimulated them, by a continued indulgence in intemperance, until they obtained the entire control of you. You have friends, a wife and children: yet, by a continued indulgence in the use of ardent spirits, all the duties of friendship —all the holier ties and duties of parent and husband, have been disregarded, and you have progressed day by day, and step by step in your downward career. Debasing and hardening yourself as you advanced, you have sunk deeper and deeper, from vice to crime, until you have taken the life of your fellow-man, and plunged your family and friends into ruin and disgrace, and are brought to end your own days in prison. Cut oforever, from society, or the hope *646 of restoration, you will Uve a spared monument of the clemency of your country’s laws; but you will live without civil rights, as one dead — your wife a widow, and your children fatherless. Will you not be persuaded to reflect upon your condition ? You cannot tell how long you may be permitted to live, and can you appear at the bar of Heaven with your sins unrepented of ? Your crime is certainly great, but God is merciful. Be persuaded then to make fervent supplications to God to change your heart, that you may repent, and have faith in the merits of the Redeemer. In this way you may acquire strength to bear your confinement with meekness; and, when you die, hoping for mercy, you may die in peace.
The judge then sentenced him to the penitentiary for life.
[Deliberation in homicide; Shoemaker v. State; 12 O. 43, 53. Definition of homicide; Fouts v. State, 8 O. S. 98, 112.]